JUDGE SULLIVAN

12 CIV 1728

RECEIVED
MAR 08 2012
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
AFFINITY LLC,

          Plaintiff,      Index No.

    -against-

                 **COMPLAINT**

GfK MEDIAMARK RESEARCH &     **JURY TRIAL DEMANDED**
INTELLIGENCE, LLC,

         Defendant.
------------------------------------------------------------------- X

## COMPLAINT

Plaintiff Affinity LLC ("Affinity"), by its attorneys Crosby & Higgins LLP, complaining of Defendant GfK Mediamark Research & Intelligence, LLC ("GfK MRI"), alleges upon information and belief as follows:

### INTRODUCTION

1. This dispute arises from GfK MRI's theft of Affinity's trade secrets and confidential business information under cover of a potential acquisition, and GfK MRI's subsequent scheme to maintain a long-standing monopoly and capture a second through predatory pricing that has now destroyed Affinity's business and eliminated competition in two relevant product markets.

2. As outlined below, print magazine advertisers have historically made their advertising placement decisions, and print magazine publishers have historically set their per-page advertising rates, based principally on traditional magazine audience research ("Magazine

Audience Research"), which focuses on measuring a print magazine title's total readership, and the demographic profile and interests of that readership.

3. For more than thirty years, the magazine audience research market (the "Magazine Audience Research Market") has been dominated by the *Survey of the American Consumer* (the "Survey"). The Survey is a biannual report derived from in-person interviews of approximately 25,000 American consumers conducted by Defendant GfK MRI, a U.S.-based subsidiary of GfK Group, the fourth largest market research organization in the world. As the only "total" audience product – the Survey measures magazine audience readership across all titles and all product categories – GfK MRI's Survey has enjoyed a long-standing monopoly in the Magazine Audience Research Market.

4. Although Magazine Audience Research can help to answer questions concerning what readership a particular magazine title has, and how it compares with the advertiser's target audience, Magazine Audience Research does not evaluate the effectiveness of the advertisement itself, a significant research gap which, if addressed at all, was done on a case by case basis using what are referred to as custom magazine advertising effectiveness research studies ("Custom Research").

5. Custom Research, unlike traditional Magazine Audience Research, gave advertisers limited insight into the effectiveness of a specific advertisement appearing in a specific issue of a magazine. Custom Research, however, was slow, expensive to generate, lacked standardization, and was so narrow in its scope as to have limited research value. Since most major advertising budgets focused on television campaigns, with magazines operating as an ancillary outlet, the print magazine advertising effectiveness research market (the "Magazine Advertising Effectiveness Research Market") remained embryonic for decades.

6. In fact, it was not until the rise of the internet and the development of an on-line advertising platform with its unique tools of measurement (*i.e.*, advertising impressions, click-through rates, tracking software, etc.), that magazine advertisers began to demand greater accountability and visibility into the effectiveness of print magazine advertising, which in turn sparked demand for a robust magazine advertising effectiveness research product.

7. Recognizing the industry's need for accountability, Tom Robinson and Marianne Grogan, veterans of the marketing and media-research industry with more than 50 years of experience between them, founded Affinity in 2004 in order to launch the first syndicated magazine advertising effectiveness research service in the United States. Affinity sought to utilize standardized effectiveness metrics (*i.e.*, a reader's engagement level and subsequent actions) in order to create a post-campaign evaluation tool that could systematically measure advertising effectiveness across magazine titles and over time.

8. In January 2005, after significant investment and more than a year of research and development, Affinity entered the Magazine Advertising Effectiveness Research Market with the launch of its VISTA Ad Effectiveness Tracking Service ("VISTA"). VISTA offered dramatic advantages over Custom Research: VISTA was cost-effective because it used modern data collection techniques and was offered on a syndicated basis so it could allocate costs among all subscribers; it was comprehensive because it measured a reader's recall of and responsiveness to an advertisement across 100-plus magazine titles; it was authoritative because it allowed standardized comparisons of advertising effectiveness over time; and it was faster because it assembled and delivered its results through a web-based methodology.

9. The marketplace rewarded VISTA's advantages. Affinity's new product quickly attracted advertisers, magazine publishers, and advertising agencies as subscribers, leading to

Affinity's fourfold revenue growth from 2005 to 2009. For the large circulation publications that VISTA analyzed, it quickly obsoleted Custom Research and transformed the Magazine Advertising Effectiveness Research Market. The extensive research and development behind VISTA, which Affinity fiercely guarded, also protected its market position; for over three years after Affinity launched its new service, no other syndicated magazine advertising effectiveness research service entered the market.

10. Not surprisingly, VISTA's success during this period drew the attention of Defendant GfK MRI, who was an affiliate of and shared the same corporate parent with GfK Starch Communications, a custom research provider whose Custom Research product had been adversely impacted by VISTA's success in the Magazine Advertising Effectiveness Research Market.

11. Prior to entering into negotiations, Affinity insisted that the parties enter a formal nondisclosure agreement ("the NDA"), which they did in April 2008, pursuant to which Affinity agreed to share its confidential business information in return for GfK MRI's commitment to "safeguard" the information and not use it for any purpose other than the "exploration and evaluation of a potential business relationship." Relying on the NDA and GfK MRI's numerous representations that it wanted to make an acquisition, Affinity divulged every aspect of VISTA to GfK MRI during months of due diligence, including detailed information related to research methodology, software programming and design, third-party contractors, operating profits and expenses, customer pricing and contracting terms, sales and marketing plans, and ongoing business strategy.

12. At no time during these discussions did GfK MRI ever disclose to Affinity that it had any plans or effort underway to develop its own syndicated advertising effectiveness

research product, either directly or indirectly through its affiliation with GfK Starch Communications. To the contrary, GfK MRI represented that it sought to acquire Affinity in order for Affinity to assume responsibility for the management of GfK Starch Communications and fold its Custom Research offering into VISTA. Indeed, GfK MRI specifically told Affinity that GfK Starch Communications was dead in the water and that GfK Group had asked GfK MRI to find something to do with the asset.

13. Unbeknownst to Affinity, however, GfK MRI never intended to keep Affinity's information confidential or to actually follow through with acquiring Affinity. Instead, GfK MRI's executives were engaged in a deliberate scheme to string Affinity along in acquisition talks, all the while – and in blatant violation of the NDA – using Affinity's trade secrets and confidential business information to construct "Starch Syndicated," a carbon-copy syndicated magazine advertising effectiveness research service of its own to compete with VISTA.

14. After delaying diligence long enough to misappropriate VISTA's confidential information, GfK MRI ended acquisition discussions in July 2008 and, in that same month, formally announced that it was "acquiring" GfK Starch Communications from GfK Group, the companies' mutual parent, and that it planned to roll out a new magazine advertising effectiveness research service. Only by misappropriating Affinity's trade secrets and confidential information and abusing its position of trust was GfK MRI able to circumvent years of research and development and immediately enter the Magazine Advertising Effectiveness Research Market with its Starch Syndicated service.

15. Throughout the remainder of 2008, GfK MRI collected advertising effectiveness data and began actively marketing Starch Syndicated to publishers and advertising agencies in direct competition with VISTA. Seeking a foothold, GfK MRI then released "Ad Measure" in or

about June 2009, a product which leveraged GfK MRI's monopoly in the Magazine Audience Research Market by using Survey data to normalize Starch Syndicated's results for a particular magazine title beyond a given sample set (which was not necessarily reflective of the actual demographics of a magazine's readership) and project them across that magazine's total audience, a distinct advantage over VISTA at the time.

16. With Magazine Audience Research added in, GfK MRI began aggressively marketing Starch Syndicated and Ad Measure. Since print magazine publishers want to use the same research products that major advertising agencies use to make placement decisions on behalf of their clients, GfK MRI began giving away Starch Syndicated and Ad Measure below or at no cost to advertising agencies in 2009, including the two largest in the world, attempting to induce publishing clients to follow the agencies in subscribing to GfK MRI's service.

17. GfK MRI's monopoly in the Magazine Audience Research Market and its offering of Starch Syndicated and Ad Measure at below or no cost posed a significant threat to VISTA's continued viability. In response, Affinity had no choice but to begin heavily investing in the development of its own total Magazine Audience Research product, the American Magazine Study ("AMS"). Affinity's decision proved shrewd as it allowed Affinity to replicate VISTA's web-based data collection methodology and survey approximately sixty thousand readers, which was more than double the number of interviews conducted by the Survey, all while reducing research costs, and therefore the cost to its subscribers. By April 2010, Affinity had launched AMS and entered into direct competition with GfK MRI in the Magazine Audience Research Market.

18. The built-in advantages to Affinity's audience research surveying methodology posed an unacceptable threat to GfK MRI; the Survey's unchallenged monopoly in the much

larger and more lucrative Magazine Audience Research Market was now squarely in the crosshairs of a nimble, entrepreneurial competitor. As detailed below, GfK MRI responded with a brazen scheme to protect its monopoly in the Magazine Audience Research Market by predatorily pricing Starch Syndicated and Ad Measure in order to starve Affinity of its VISTA revenues, which was the funding source behind AMS, thereby pushing Affinity out of business and eliminating competition.

19. Using Affinity's confidential business information, including VISTA pricing, operating expenses, and customer contract information, GfK MRI was able to target specific Affinity clients and calculate at what price, and for how long, it had to sell Starch Syndicated and Ad Measure to them in order to oust Affinity from the market. Lured by the prospect of eliminating costs associated with magazine advertising effectiveness research and receiving Starch Syndicated and Ad Measure at a fraction of the true cost that GfK MRI incurred to produce its data – including, in some cases, giving it away for nothing at all – customers rapidly abandoned VISTA, forcing Affinity to withdraw VISTA and AMS from the market and close its doors in February 2012.

20. In the process of preserving its monopoly in the Magazine Audience Research Market, GfK MRI sought to eliminate competition from VISTA as well, which was the only rival service to Starch Syndicated and Ad Measure in the Magazine Advertising Effectiveness Research Market, thereby capturing a second monopoly that will now allow GfK MRI to recoup revenues lost from its predatory pricing and much more.

21. Competition is unlikely to emerge in either the Magazine Audience Research Market or the Magazine Advertising Effectiveness Research Market given the high barriers to

entry and GfK MRI's limitless ability to absorb market share. In the absence of competition, consumers of products in both of these markets will now pay supracompetitive prices.

22. With no other recourse available and a lifetime of investment destroyed, Affinity brings this lawsuit to recover statutory, compensatory, and punitive damages arising out of GfK MRI's anticompetitive course of conduct, all as alleged in detail below.

## THE PARTIES AND THEIR AFFILIATES

23. GfK MRI, a subsidiary of GfK Group, is a Delaware limited liability company doing business in the state of New York, with its principal place of business located in New York, New York. GfK MRI provides Magazine Audience Research, Custom Research and syndicated advertising effectiveness research to the magazine industry.

24. GfK Group, a global research corporation, was established over 75 years ago as Germany's first market research institute. GfK Group is a foreign corporation, with its principal place of business located in Nuremberg, Germany. It has reported sales of $1.7 billion for 2010.

25. Affinity is a New York limited liability company with its principal place of business having been located in New York, New York.

## JURISDICTION AND VENUE

26. Affinity brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) as a result of GfK MRI's violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and under New York law.

27. This Court has subject-matter jurisdiction over Affinity's federal claims pursuant to 28 U.S.C. §§ 1331, 1337.

28. The facts underlying the claims for relief under the Donnelly Act, N.Y. Gen. Bus. Law § 340, and New York state common law share a common nucleus with the federal antitrust